# CHARLESTON.

## STATE v. STALEY.

Submitted Dec. 10, 1898.—Decided Jan. 20, 1899.

1. VERDICT—*Homicide—Form of Verdict.*
    "We, the jury, agree and find the defendant, Virgil Staley, not guilty of murder in the first or second degree, as charged in the within indictment, but do agree and find the defendant, Virgil Staley, guilty of voluntary manslaughter,"—is a verdict sufficient in form   (p 794).

2. COURT HOUSE—*Place of Holding Court.*
    When the place of holding the courts of any county has been changed to another building in the same town temporarily, under section 7,, chapter 114, Code, for the reason that the court house has been destroyed, no formal ceremony or notice is necessary to authorize the holding of courts in the new court house provided upon the site of the old one, when the same is ready for occupancy and in possession of the county authorities.   (p. 795).

3. COURT HOUSE—*Place of Holding Court.*
    Whenever such new court house is ready for occupancy, the reason for holding the court at such other place appointed has

ceased, and the courts are properly held in the new court house. (p. 795).

4. INSTRUCTIONS—*Error.*

Point 4, Syl., in *State* v. *Bingham*, 42 W. Va. 234, approved. (p. 799).

5. EVIDENCE—*Conflict of Evidence—Jury.*

Point 5, Syl., in *Slate* v. *Zeigler*, 40 W. Va. 594, disapproved and overruled. (p. 800).

6. EVIDENCE—*Witness—Impeachment—Credibility of Witness.*

The credibility of a witness who has been impeached by proof of a former declaration at variance with his testimony may be supported by evidence of his good character for truth and veracity. (p 801)

7. EVIDENCE—*Witness—Impeachment.*

Where a witness is introduced by plaintiff for the first time in rebuttal, the defendant should be permitted to introduce evidence to impeach him. (p. 801).

8. REMARKS OF JUDGE—*Trial Court—Error.*

Remarks made by the trial judge in the presence of the jury (referring to a witness who had testified for the State), as follows: "Suppose Dr. Burgess, whose integrity is not to be questioned, when placed by a party upon the witness stand to testify as to matters coming within his professional conduct or employment, and having so testified, the opposite party was to bring in two or three witnesses from another county, say, from Huntington, who were entire strangers to the people of Wayne county, and who, upon the witness stand, were to testify to their having heard Dr. Burgess, in Huntington, make statements directly contradicting those made by him on the witness stand; would it not be a reasonable and logical rule that would permit the party so calling him to introduce, upon rebuttal, witnesses acquainted with his general reputation, to testify as to his good character for truth?"—the "two or three witnesses" referred to being summoned as experts on behalf of the defendant, and so testified in the case, touching the matter of the evidence of said witness Burgess,—*held* to be error, which might prejudice the defendant. (p. 805).

Error to Circuit Court, Wayne County.

Virgil Staley was convicted of voluntary manslaughter, and brings error.

*Reversed.*

MARCUM, MARCUM & SHEPHERD and J. M. TIEMAN, for plaintiff in error.

EDGAR P. RUCKER, ATTORNEY-GENERAL, and EDWIN M. KEATLEY, for the State.

McWHORTER, JUDGE:

Upon an indictment against Virgil Staley in the circuit court of Wayne County for the murder of Lafe Adkins, in the form laid down in section 1, chapter 144, Code, the jury returned a verdict as follows: "We, the jury, agree and find the defendant, Virgil Staley, not guilty of murder in the first or second degree, as charged in the within indictment, but do agree and find the defendant, Virgil Staley, guilty of voluntary manslaughter." . The prisoner, by his counsel, moved the court to set aside the said verdict, and grant him a new trial, because the verdict is not in good form, and because it is not certain, but is uncertain and indefinite, and does not state the jury finds the defendant guilty of any offense charged against him in the indictment in the case, which motion was overruled, and exceptions taken. Appellant's counsel say this was error, and that their contention on this point is clearly borne out in *State* v. *Newsom* 13 W. Va. 859, where it is held that no judgment could be entered upon the verdict in that case, because it was too vague, indefinite, and uncertain. That was an indictment under section 9, chapter 144, Code 1868, for unlawful shooting, etc. The verdict was: "We, the jury find the prisoner, James Newsom, guilty of unlawful shooting with intent to maim, disable, disfigure, and kill, and ascertain the term of his confinement in the penitentiary at one year; and we find him not guilty of malicious shooting." It will be observed that the verdict just quoted makes no reference whatever to the indictment. In *Hoback* v. *Com.*,28 Grat. 922, the verdict is in almost the precise words as the one at bar: "We, the jury, find the defendant John Hoback, not guilty of malicious shooting, as in the within indictment charged, but guilty of unlawful shooting with intent to maim, disfigure, disable, and kill, and fix his term of confinement," etc.,— which verdict was sustained. The whole verdict must be taken together, and being indorsed on the indictment, or referring to it, such reference applies as to the whole verdict, and there can be no uncertainty about it. Judge Moncure, in his opinion in *Hoback's Case* says: "A verdict of a jury in a criminal case must always be read in connection with the indictment. And if it be certain, upon reading them together, what is the meaning of the verdict, it is sufficiently certain."

It is contended also, as set out in the bill of exceptions No. 10, that the court erred in refusing appellant's motion to set aside the verdict and grant him a new trial, because the trial was not commenced, held, and had at the court house of Wayne County (wherein the trial was held), and also in refusing his motion in arrest of judgment upon said verdict, as set out in his bill of exceptions No. 11.  In support of his contentions, he introduced witnesses, as well as the proclamation of the governor, to prove that the court house of Wayne County, on the 6th day of March, 1896, was totally destroyed by fire, and that the lower room of the Odd Fellows' Building, in the town of Fairview, wherein the court house was located, had been by the governor of the State, under section 7, chapter 114, Code, designated and appointed as the place for holding the county and circuit courts for said county so long as the reason therefor might continue.  The court house of the county had been burned, and, under the statute, temporary provision had been made for holding the courts in another building, only as long as the reason therefor continued.  When the court house was replaced and fit for occupation, the reason for holding the court elsewhere continued no longer, and it appears from the record that the court was being held in the court house when the trial of appellant was began, and was had and completed there.  Section 11, chapter 114, Code, provides that "when the place of holding any court or the day for commencing any term is changed.  *  *  *  there shall be no discontinuance, but every notice, recognizance or process taken or returnable to the day on which the failure occurred, or to any day between that day and the next that the court may sit, or to the day and place as it was before such change,  *  *  *  shall be in the same condition and have the same effect, as if given, taken or returnable, or continued to the substituted time and place," etc. It was doubtless a notorious fact that court was being held in the new court house, the place provided especially for it, and I see no provision in the statute for any ceremony to enable the county authorities to take possession or occupy the building erected for that purpose; but, whenever it is so occupied, the temporary occupation of the substituted place has ceased, and the reason for its occupation no longer continues; and to cease to occupy for court purposes

the regular court house again, no matter how informally it may have been appropriated to the use of a court house, some one of the reasons for vacating it set forth in section 7 of chapter 114 of the Code must exist, and the necessary steps taken therefor under said chapter. The trial began and was proceeded with, without objection, until its close, when, before sentence of the prisoner, he moved in arrest of judgment for that reason, which motion was properly overruled. This is a purely technical objection. No constitutional right of the prisoner was violated, nor was he in any way prejudiced by it.

Appellant's bill of exceptions No. 2 is to the giving of the State's instructions to the jury, Nos. 1 to 7, inclusive: Instruction No. 1: "The court instructs the jury that, where a homicide is proved, the presumption is that it is murder in the second degree. If the State would elevate it to murder in the first degree, she must establish the characteristics of the crime; and, if the prisoner would reduce it to manslaughter, the burden of proof rests upon him." Instruction No. 2: "The court instructs the jury that a man is presumed to intend that which he does, or which is the immediate or necessary consequence of his act. And if the prisoner, with a deadly weapon in his possession, without any or upon very slight provocation, gives to another a mortal wound, the prisoner is *prima facia* guilty of willful, deliberate, and premeditated killing, and the necessity rests upon him of showing extenuating circumstances, and unless he proves such extenuating circumstances, or the circumstances appear from the case made by the State, he is guilty of murder in the first degree." Instruction No. 3: "The court instructs the jury that the use of a deadly weapon being proved, and the prisoner relies upon self-defense to excuse him for the use of the weapon, the burden of showing such excuse is on the prisoner, and, to avail him, he must prove such defense by a preponderance of the evidence." Instruction No. 5: "The court instructs the jury that the fact of one person having threatened to take the life of another or to inflict upon him a great bodily injury will not excuse the person so threatened in becoming the aggressor, and with deadly weapon assaulting the person making such threats, and that although the jury may believe from the evidence that Lafayette Adkins, in his life-

time, had made threats to take the life of the prisoner or to inflict upon him great bodily harm, the fact of making such threats towards the prisoner will not justify a verdict of acquittal, unless the jury further find that, at the time the said Lafayette Adkins was shot, he was making overt acts towards the prisoner, indicative of an intention to carry such threats into immediate execution, and that, by reason of such threats and overt acts, he (the prisoner) believed that it was necessary then and there to shoot with a deadly weapon the said Lafayette Adkins, in order to save his (the prisoner's) life, or to protect him from great bodily harm." Instruction No. 4: "The court instructs the jury that they are the sole judges of the weight of testimony of any witness who has testified before them in this case at bar, and that, in ascertaining such weight, they have the right to take into consideration the credibility of such witnesses, as disclosed from his evidence, his manner of testifying and demeanor upon the witness stand, and his apparent interest, if any, in the result of the case. And, if the jury believe that any witness has testified falsely as to any material fact, they have the right to disregard all the testimony of such witnesses so testifying falsely, or to give his testimony, or any part thereof, such weight only as the same in their opinion, may be entitled to." Instruction No. 6: "The court instructs the jury that after they shall have compared and considered all the evidence in the case, if they have a reasonable doubt as to the guilt of the prisoner, Virgil Staley, as charged in the indictment, they cannot convict; that by reasonable doubt is meant such doubts based upon the evidence as they may honestly and reasonably entertain as to any material fact essential to prove the crime charged. It must not be an arbitrary doubt, without evidence to sustain it, but must be serious and substantial in its nature, in order to warrant an acquittal, and one which men may honestly and conscientiously entertain." Instruction No. 7: "The court further instructs the jury that, if they find the prisoner guilty as charged in the indictment, they shall further find whether he is guilty of murder in the first of second degree. If they find him guilty of murder in the first degree, they may, in their discretion, further find that he (the prisoner) be punished by confinement in the peni-

tentiary; and, if such further finding be not added to such verdict, the judgment thereupon rendered by the court will be that the prisoner be punished with death; and, if such further finding is added, the judgment thereupon rendered by the court will be that the prisoner be confined in the penitentiary during his life. If they (the jury) find the prisoner guilty of murder in the second degree, as charged in the indictment, the punishment imposed upon the prisoner will be confinement in the penitentiary not less than five years nor more then eighteen years."

While the exceptions go to all these instructions, a careful examination of the first six fails to disclose anything objectionable or which could be prejudicial to the rights of the appellant, and no special or definite objections are raised thereto. It is contended, however, that No. 7 is clearly wrong, in that it tells the jury what penalty could be imposed upon the prisoner if they should find him guilty of either murder in the first or second degree; that the court, in using the language of the instruction, expresses its opinion as to the weight and sufficiency of the evidence in the case to warrant the jury in finding the prisoner guilty of murder in the first degree; that such a verdict, in the court's opinion, would be a proper verdict,. The court only propounded the law as laid down in the statute. The prisoner was charged with murder. He did not deny the killing. He assumed the burden of proving that the killing was done in self-defense. Whether he had succeeded, or to what extent he had succeeded, was a question solely for the jury. It was entirely proper for the jury to understand what would be the result of this verdict,—what punishment would follow. The verdict itself shows that the jury were not misled by the instruction, and that they by no means took the view of the instruction as contended by appellant.

Bill of exceptions No. 3 complains of the ruling of the court in refusing to give instructions Nos. 6, 8, and 10, and each of them. No. 6: "The court further instructs the jury that if, from all the facts, circumstances, and evidence in this case, they have a reasonable doubt as to the defendant's guilt they must find him not guilty." No. 8: "The court further instructs the jury that the law presumes the defendant, Virgil Staley, innocent until he is clearly and conclusively proven guilty beyond all reasonable doubt;

and, if there is upon the minds of the jury any reasonable doubt of the defendant's guilt, the law makes it their duty to find him not guilty; that, even if there was suspicion or probability of his guilt, however strong, such suspicion or probability would not be sufficient, even though the greater weight or preponderance of evidence supported the charge in the indictment, nor, upon the doctrine of chances, it were more probable that the defendant is guilty; but to warrant his conviction,his guilt must be proved so clearly and conclusively that there is no reasonable theory upon which he can be innocent, for the policy of our law deems it better that many guilty persons should escape rather than that one innocent person should be convicted." As to No. 6, while it propounds the law correctly, the court had thoroughly instructed the jury on the question of reasonable doubt by giving state's instruction No. 6, and defendant's instructions Nos. 1 and 3, as follows: No. 1: "The court instructs the jury that the law presumes that the defendant, Virgil Staley, is innocent of the crime charged against him in the indictment in this case, and that such presumption follows him throughout every step of the trial; that it is incumbent upon the state to establish the prisoner's guilt by proof so clear and convincing and satisfactory in its nature as to convince the jury of his guilt beyond all reasonable doubt; that before the jury can find the defendant guilty in this case, they must believe and be satisfied from the evidence in the case, beyond all reasonable doubt, that he is guilty; that if the jury, or any member of the jury, after having carefully weighed and considered all the evidence in the case, should entertain a reasonable doubt as to the guilt of the defendant, they cannot return a verdict of guilty." No. 3: "The court further instructs the jury that, in determining the question of the defendant's guilt or innocence in this case, it is their duty to take into consideration the good character of the defendant, as developed from the evidence in this case; and, if from such evidence, as well as from all the other evidence, facts, and circumstances in this case, the jury have a reasonable doubt as to the guilt of the defendant, they must find him not guilty."

It was not error to refuse No. 6. In *State* v. *Bingham*, 42 W. Va. 234, (24 S. E. 883, Syl. point 4), it is held that "when instructions given clearly and fairly lay down the

law of the case, it is not error to refuse other instructions on the same subject. The court need not repeat instructions already substantially given." See, also, *Davidson* v. *Railway Co.*, 41 W. Va. 407, (23 S. E. 593, Syl. point 2). Instruction No. 8 is also upon the question of reasonable doubt, but goes much further than the other instructions given on that point, and which fully propound the law, while No. 8 would, if given, tend to confuse and mislead the jury, and was properly rejected. It is contended that instruction No. 10, being in the exact language of point 5, Syl., in *State* v. *Zeigler*, 40 W. Va. 594, (21 S. E. 763), should have been given, that it was error to refuse it. While it is true it is so held in the *Zeigler Case*, yet it is in conflict with instruction 3 given for the State, which is a copy of point 1, Syl., in *State* v. *Jones*, 20 W. Va. 764; and it is also a fact that the opinion in the *Zeigler Case* quotes with approval the holding in the *Jones Case* and on page 609 says: "The first instruction asked for by the prisoner was properly rejected, as it fails to state the law as laid down in the case of *State* v. *Jones*, 20 W. Va. 764;" and yet the said "first instruction" somehow, evidently by inadvertence, crept in as a syllabus of the case. In *Com.* v. *York*, 9 Metc. (Mass.) 93, it is held that "when, on a trial of an indictment for murder, the killing is proved to have been committed by the defendant, and nothing further is shown, the presumption of the law is that it was malicious, and an act of murder; and proof of matters of excuse or extenuation lies on the defendant, which may appear either from evidence adduced by the prosecution, or from evidence offered by the defendant. But, when there is any evidence tending to show excuse or extenuation, it is for the jury to draw the proper inferences of fact from the whole evidence, and to decide the fact upon which the excuse or extenuation depends, according to the preponderance of evidence." *Silvus* v. *State*, 22 Ohio St. 90; *Weaver* v. *State*, 24 Ohio St. 584; *State* v. *Willis*, 63 N. C. 26; *Hill* v. *Com.*, 2 Grat. 595; *State* v. *Greer*, 22 W. Va. 800, Syl. point 19. The court did not err in refusing said instruction No. 10, because it does not correctly propound the law.

Appellant's bill of exceptions No. 4, referred to in the fifth assignment of error, shows that, when defendant was on the witness stand in his own behalf, he was on cross-ex-

amination asked if he had not had conversations at certain times and places with certain parties named, wherein he had made threats against Lafe Adkins, which threats he denied; and the State, in rebuttal, introduced the testimony of such parties with whom he had had the conversations wherein he had made such threats, etc., and thereby contradicted said defendant as to such conversations; and the State then rested her case, when defendant offered to prove by witnesses well acquainted with defendant, and with his general reputation for truth and veracity in the community in which he lived, that he sustained a good and unimpeachable reputation for truth and veracity among all his neighbors in the county in which he lived, which evidence the defendant was not permitted to introduce. "The credibility of a witness who has been impeached by proof of a former declaration at variance with his testimony, may be supported by evidence of his good character for truth and veracity." 10 Enc. Pl. & Prac. 326, and cases there cited. Evidence of the contradictory statements must actually be introduced. Merely laying the foundation is not sufficient to let in evidence of good character. *State* v. *Cooper*, 71 Mo. 436.

Bill of exceptions No. 5 involves the same matter, and, further, defendant proposed to introduce witnesses who were neighbors and well acquainted with Thomas D. Hutchison, one of the witnesses who so contradicted defendant, and with his general reputation for truth and veracity among his neighbors, to prove that such reputation was bad, and, that he was not entitled to credit as a witness which evidence the court refused to admit for the reason stated,—that, according to the rules and practice of all courts, the rebuttal testimony by the State concluded the evidence in the case, and the defendant could not and should not introduce any further testimony in the case. If the witness proposed to be impeached had been before examined by the State on the main issue, the court would have it in its discretion to so rule when the witness was recalled in rebuttal, but, being introduced in rebuttal for the first time, the defendant should have the right to impeach him if he could.

Bill of exceptions No. 6 presents the converse of this question raised in No. 4. State's witness Shird Mullins, on

cross-examination had been inquired of as to certain con-
versations he had had with various persons named relative
to his knowledge of certain facts and circumstances attend-
ing the killing of Adkins, and tending to contradict the
evidence given by the witness at the trial, and the defend-
ant had introduced the said several persons as witnesses
to contradict witness Mullins, when the court permitted
the State to introduce witnesses to prove the general good
reputation of Mullins for truth and veracity, to which rul-
ing of the court permitting such testimony to be given de-
fendant excepted.  For the reasons before given, the court
did not err therein.

The eighth bill of execptions, referred to in the eighth
assigment of error, is as follows:  "Be it remembered that,
upon the trial of this cause, the defendant, Virgil Staley,
had caused to be summoned and sworn, as witnesses for
him and in his behalf, Dr. L. J. Stump and Dr. C. C. Hogg,
two regular practicing physicians residing in Cabell county,
in the city of Huntington; that it was well known in the
court and to the attorneys for the State that said witnesses,
Stump and Hogg, had been summoned to testify on the
part of the defeudant, and for the purpose of showing,
by them, that the death of Lafe Adkins, the party
named in the indictment as having been shot and
killed by Virgil Staley, was not caused nor produced by the
wounds alleged to have been inflicted upon his body by the
said defendant, but was, in fact, caused and produced by an
operation that was performed upon him, after said wounds
had been inflicted, by his attending physicians, Drs. G. R.
Burgess, A. G. Wilkinson, and —— Bruns.  And be it
further remembered that during the progress of the trial,
and at the time when the State was offering to introduce
certain witnesses for the purpose of supporting the testi-
money of one Shird Mullins a witness who had been exam-
ined on behalf of the State, and who had been contradicted
by various witnesses examined on behalf of the defendant,
by showing that he, the said Mullins, had made statements
out of court relative to his knowledge of the facts of the
killing of the said Lafe Adkins that contradicted his evi-
dence upon the witness stand, that the defendant objected
to the introduction of the evidence tending to prove the
general reputation for truth and veracity of the said wit-

ness, Mullins. And be it further remembered that after the objections so made by the defendant to the introduction of said evidence had been fully discsssed by counsel for the State, as well as for the defehdant, the court proceeded to render its judgment or opinion upon said objection, overruling said objection, and giving its reasons at length therefor; and that, while so giving its reasons as aforesaid, the court stated, in hearing of the jury trying the case, as follows, to-wit: "The question before the court is, can the State, after defendant's witnesses have testified to statements alleged to have been made by Shird Mullins out of court contradicting those made by him upon the witness stand, introduce other witnesses by way of rebuttal to prove his good character for truth? Jones, in his work on Evidence (section 847), says that one way to impeach a witness is by proving statements of the witness made out of court inconsistent with or contradicting those made by him upon the witness stand. If the witnesses so contradicting Mullins are worthy of credit, then he has made false statements as to the same subject-matter, either out of court or upon the witness stand. Now, for the purpose of illustrating, let us take Dr. Burgess. Defendant's attorneys have used him as a means of illustrating in their argument upon this question. Suppose Dr. Burgess, whose integrity is not to be questioned, were placed by a party upon the witness stand to testify as to matters coming within his professional conduct or employment, and, having so testified, the opposite party were to bring here two or three witnesses from another county—say, from Huntington—who were entire strangers to the people of Wayne county, and who, upon the witness stand, were to testify to their having heard Dr. Burgess in Huntington make statements directly contradicting those made by him upon the witness stand; would it not be a reasonable and logical rule' that would permit the party so calling him to introduce, upon rebuttal, witnesses acquainted with his general reputation to testify to his good character for truth? Jones, in his work on Evidence, in section 871, says that the authorities in this country on this question are conflicting, and in support of the rule cites a number of decisions, among which is that of *George* v. *Pilcher*, 28 Grat. 299. If this has been the rule in the State of Virginia, the same rule, and

I think the right one, should, by inheritance, prevail in West Virginia. The said Dr. Burgess above referred to being the same Dr. Burgess who had testified upon this trial as a witness relative to the character of the wounds inflicted upon the body of the said Lafe Adkins, and as to the manner of performing the operation upon him. Which said remarks so made by the court, in the presence and hearing of the jury as aforesaid, the defendant then and there expected to, upon the ground that said remarks so made by the court relative to the character and standing of the said witness, G. R. Burgess, as a man and a physician, tended to influence the jury in the weight to be given to his said evidence in favor of the State, and tended to the prejudice of the prisoner in weakening the evidence and the weight thereof of the physicians Hogg and Stump, which were thereafter given to the jury, and prays that his bill of exceptions No. 8 be signed, sealed and saved to him, which is accordingly done."

The courts have ever been exceedingly careful of the province of the jury in the trial of cases. In *McDowell* v. *Crawford*, 11 Grat. 405, Judge Moncure quotes approvingly 1 Rob. Prac. 338-344, where the cases are collected, and says: "They evince a jealous care to watch over and protect the legitimate powers of the jury. They show that the court must be very careful not to overstep the line which separates law from fact. They establish the doctrine that, when the evidence is parol, any opinion as to the weight, effect, or sufficiency of the evidence submitted to the jury, any assumption of a fact as proven, or even an intimation that written evidence states matters which it does not state, will be an invasion of the province of the jury." Judge Green, in *State* v. *Hurst*, 11 W. Va. 51, referring to those cases cited by Judge Moncure, says they were all civil cases, and that "there is and ought to be a distinction between the trial of civil and criminal cases in many important particulars," and continues: "If the province of the jury in a criminal case may be allowed to be invaded, the liberty and lives of the citizens would not be safe. In times of peril, when commotions in the state exist untrammeled, jury trials are the greatest safeguard of the citizens. If, in a civil case, it is error, for which the verdict should be set aside and the judgment revoked, for

the court to make a remark, in the presence of the jury, calculated to mislead them, or calculated to cause them to give more or less weight to any testimony before them, for much stronger reasons would it be error to make the same remark in the trial of a criminal case." This subject is discussed at some length by JUDGE DENT in *Neill* v. *Produce Co.*, 38 W. Va. 228, (18 S. E. 563), and the cases there cited. The remarks made by the judge in this case, it is true, were by way of illustration; but unfortunately, for the purpose of the illustration, he named one of the State's witnesses who had been examined in the case, and referred to him as one "whose integrity is not to be questioned." Suppose that he were placed by a party upon the witness stand to testify as to matters coming within his professional conduct or employment (just as the witness referred to had testified in this case), and, having so testified, the opposite party were to bring two or three witnesses from another county,—say from Huntington,—who are entire strangers to the people of Wayne County, and who, upon the witness stand, were to testify to their having heard the said State's witness make statements directly contradicting those made by him upon the witness stand, etc. While the judge did not mention the names of the supposed witnesses from Huntington, yet it was a fact that defendant had two witnesses from Huntington, summoned there, and placed them upon the stand to testify in the case as experts touching the matter of the evidence given by the witness Burgess. What was necessarily the tendency of the remarks on the minds of the jury but to make an impression thereon highly favorable to the testimony of the State's witness, who was so referred to by the court, as of unquestioned integrity, and, consequently, his testimony was entitled to the greatest weight, while the other witnesses were mentioned as entire strangers, brought from another county, whom the people of Wayne county did not know? The tendency of the remark would be to weaken their testimony in the estimation of the jury, to the prejudice of the defendant. Whether it affected their verdict or not we cannot tell. Taking the whole record together, I am inclined to the opinion that none of the errors complained of really affected the minds of the jury prejudicially to the rights of the defendant; yet they

may have done so, and, without such errors, it is possible the jury might have returned a verdict more favorable to him. For the reasons herein stated, the verdict will be set aside, the judgment revoked, and the case remanded for a new trial to be had therein.

*Reversed.*